UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
JESSICA BRENNER,

                                                 Plaintiff,

                        -against-                                          **COMPLAINT AND**
THE CITY OF NEW YORK; MAYOR ERIC L. ADAMS;      **JURY DEMAND**
CITY OF NEW YORK DEPARTMENT OF
CORRECTION COMMISSIONER LOUIS MOLINA;
CORRECTION OFFICER ANTHONY MARTIN, JR.,

                                               Defendants.
------------------------------------------------------------------------ X

## **INTRODUCTION**

1. Karina Collado was detained at the Rose M. Singer Center – a detention center on Rikers Island for women -- around March and April of 2020. She was on a "special assignment" to organize and restock office supplies in an office in the facility. She was being supervised by Defendant Correction Officer Anthony Martin, Jr. ("C.O. Martin").

2. While working in the office, C.O. Martin asked if she "wanted to play", and proceeded to hold her down and forcibly insert her fingers into her vagina as well as fondle her in other ways.

3. Ms. Collado feared retaliation, but when she was received at Bedford Hill Correctional Facility in May, 2021, she sent a complaint report to Rikers Island officials about the sexual assault by C.O. Martin. No action was taken and C.O. Martin was allowed to continue to work in the women's Rose M. Singer Center to continue to prey on female detainees.

4. On or about June 20, 2023, Plaintiff Jessica Brenner was working a special assignment under the supervision of C.O. Martin. At the end of the work day, Ms. Brenner and three other women were supposed to be escorted back to their housing unit. Instead, he took them to an empty office, locked the door, and told them they would "play" "Simon says". Suffice it to

say, C.O. Martin played Simon.

5. "Simon" (C.O. Martin) demanded that Ms. Brenner turn his back to him and pull down her pants to expose her buttocks. He then demanded that she "twerk" in front of him. He then demanded that another of the women "hump" her i.e. rub her genitals against her buttocks. He then demanded that the woman "smack her ass" and she was smacked and fondled.

6. The Department of Correction's failure to take any action at least after Ms. Collado's complaint caused the sexual abuse of Ms. Brenner. In turn, their failure to turn the matter over to a competent law enforcement agency for the crimes he was committing caused a woman to be raped in his home in 2024. He was indicted for First Degree Rape in August, 2024 and upon information and belief, he is still employed by the Department of Correction.

7. Speaking on C.O. Martin's behalf, his attorney Steven Jared Gaitman stated that the allegations by the Rikers detainees "sounds like a bunch of B.S."

8. Even though City policymakers have long-known of the unconstitutional conditions at Rikers and risk of rape and sexual abuse of female detainees – from personal observations, prior lawsuits, public reports, governmental investigations, and the City's own internal reports – City policymakers have utterly failed to take the necessary steps to remedy the conditions at Rikers.

## PRELIMINARY STATEMENT

9. This is a civil rights action in which Plaintiff seeks relief for the violation of her rights secured by 42 USC §§1983 and 1988, and the Eighth and Fourteenth Amendments to the Constitution of the United States of America, as well as the laws of the State of New York and the City of New York.

10. The claim arises from the sexual abuse of Jessica Brenner ("Ms. Brenner") and

the enabling and unconscionable deliberate indifference to the sexual abuse perpetrated at the Rose M. Singer Center by C.O. Martin and others, causing Ms. Brenner to be sexually abused.

11.    Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

12.    This action is brought pursuant to 28 USC §1331 and 42 USC §1983. Supplemental jurisdiction of state law claims is asserted.

13.    Venue is laid within the United States District Court for the Southern District of New York in that the claim occurred within the boundaries of the Southern District of New York.

## PARTIES

14.    Plaintiff Jessica Brenner is a citizen of the United States and at present a resident of Queens, NY. She is a 35 year old woman. At all times here relevant she was being detained by the New York City Department of Correction ("DOC") on Rikers Island at the Rose M. Singer Center.

15.    Defendant the City of New York is a municipal corporation organized under the laws of the State of New York. The Department of Correction is an agency of the City of New York.

16.    Defendant Mayor Eric L. Adams was at all times here relevant the Mayor of the City of New York. He has final policymaking and decision-making authority with respect to the DOC. He is sued in his individual and official capacities.

17.    Defendant Louis Molina was at all times here relevant the Commissioner of the New York City Department of Correction. He has final policymaking and decision-making

authority with respect to the DOC. He is sued in his individual and official capacities.

18. Defendant Correction Officer Anthony Martin, Jr. was at all times here relevant employed by the DOC. He is sued in their official and individual capacities.

19. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

20. On or about May 13, 2024, Plaintiff Jessica Brenner was arrested in New York City.

21. She was arraigned and bail was set for her release.

22. Being unable to make bail, she was remanded to Rikers Island while her charges were pending.

## JESSICA BRENNER'S ARRIVAL AT RIKERS

23. On or about May 14, 2024 Ms. Brenner arrived on Rikers Island. She was assigned to the Rose M. Singer Center, the detention center where women are housed.

24. She was considered a non-violent detainee where she was housed with other similarly classified detainees.

25. Ms. Brenner wanted to work while she was incarcerated and was given a (relatively) favorable assignment to the Sanitation Unit.

## JESSICA BRENNER'S SPECIAL PROJECT SUPERVISED BY C.O. MARTIN

26. She was given a special project with three other women. Boxes containing old files were brought to their location. Ms. Brenner and the three other women were assigned to remove the files and re-file them into labeled boxes.

4

27. As the project proceeded over a two week period, the four women were supervised and monitored by Correction Officer Smalls and Defendant C.O. Martin.

28. The women never had a problem with C.O. Smalls.

29. Ms. Brenner had heard that C.O. Martin had been accused of sexual misconduct involving female detainees and that there was a PREA (Prison Rape Elimination Act) complaint against him. However, until the last day of the project, the four women did not have any problem or issue with him. Mostly C.O. Martin would just look at his phone while he monitoring them.

### C.O. MARTIN'S SEXUAL ABUSE OF JESSICA BRENNER

30. In the evening, on or about June 20, 2023 the project was completed. Defendant C.O. Martin was on duty that night supervising the team of four women, including the Plaintiff.

31. At the conclusion of the work, C.O. Martin was expected to escort the women back to their housing unit. Instead, he escorted them down unexpected corridors into an office. It was just the five of them, Ms. Brenner, C.O. Martin, and the three other women.

32. Defendant Martin locked the office door and told them they were going to play "Simon Says". Simon Says is a children's game where a leader tells the group of children what to do and if they fail to comply they are out of the game.

33. The four adult women had no choice but to play Simon Says with their supervising officer Anthony Martin. C.O. Martin directed that Ms. Brenner turn so her back was facing him. He commanded that she lower her pants and underwear down her legs to expose her buttocks. He then commanded that she "twerk", which involves thrusting your hips back and shaking your buttocks. He then commanded that another of the women come up behind her and "hump" Ms. Brenner buttocks. The other woman complied with the command by rubbing her genitals against Ms. Brenner's bare buttocks. He then commanded the other woman to "smack" Ms. Brenner's

5

buttocks, which the woman complied with. Her buttocks were also being touched and fondled either by the woman or by Defendant Martin, Ms. Brenner could not be certain as her back was turned pursuant to Martin's "Simon says" demand.

34. Ms. Brenner stopped complying with C.O. Martin's commands and pulled up her pants. This caused C.O. Martin to cease playing the "game" and commanding the women to engage in such degrading sexual acts.

35. He escorted them back to their housing unit and gave each of them gum.

## C.O. MARTIN ATTEMPTS COVER-UP

36. Apparently, one of the other women involved in the Simon Says game told her counselor about what happened. The counselor reported it to C.O. Martin's supervising Captain.

37. A few days after the incident, Ms. Brenner was going to synagogue services with a few other female detainees. C.O. Martin approached and separated her from the other women.

38. He told her that the incident had been reported to a counselor and that his Captain had approached him about it. He demanded that she write a statement saying nothing happened. She replied to him that she would do it later so he would leave her alone. However, she did not write the statement.

39. Fearful and humiliated, she did not dare make a complaint about the sexual abuse. On July 18, 2023, she was transported to Nassau County jail for a court appearance. She expected to return to Rikers in two days. Instead, she was kept in Nassau County for approximately one and a half months.

40. On September 11, 2023, she was released from jail with no money and into homelessness.

## THE CITY, MAYOR, AND COMMISSIONER'S OMMISSIONS AND COMMISSIONS THAT CAUSED THE SEXUAL ABUSE OF MS. BRENNER

41. As described in the Introduction of this Complaint, in 2020 Karina Collado, a previous female detainee at the Rose M. Singer Center, filed a complaint with DOC officials describing the sexual abuse perpetrated against her by Defendant C.O. Martin under similar circumstances.

42. DOC officials have acknowledged that they did not act on the complaint.

43. In addition, on May 30, 2023, Karina Collado filed a Complaint in New York State Supreme Court, Bronx County, against the City of New York alleging that C.O. Martin sexually abused Ms. Collado by *inter alia*, forcibly holding her down and forcing his fingers into her vagina. The Complaint was served on June 1, 2023, three weeks before the incident that occurred herein.

44. Karina Collado alleges in her complaint that she reported the 2020 incident to Correction Officer Macintosh, who responded that she "wasn't the first and wouldn't be the last" female detainee C.O. Martin sexually assaulted. Still no corrective action was taken.

45. Indeed, Ms. Brenner herself had heard from numerous sources in the facility that C.O Martin had a propensity to sexually abuse women detainees. A press report – about five correction officers accused of rape and sexual abuse who still work for DOC -- notes that the Defendant C.O Anthony Martin, Jr. is named in another sexual abuse against a detainee lawsuit and that there are "Martins" named in three other sexual abuse lawsuits that allegedly occurred in 2016, 2018 and 2021.[1]

46. In addition to Ms. Collado, 36 other present and former female detainees filed and

---

[1] "Women accused these jail guards of sexual assault. The men still work at Rikers". *Gothamist*, September 3, 2024. Taken on September 10, 2024. https://gothamist.com/news/women-accused-these-jail-guards-of-sexual-assault-they-still-work-at-rikers

served actions under the Adult Survivors Act against the City claiming that DOC officials raped or sexually abused them prior to the sexual abuse of Ms. Brenner. A deluge followed of over 700 lawsuits alleging sexual abuse and rape by DOC's officials over the following months.

47. Plaintiff has served the City with FOIL requests with the hopes of obtaining information about the investigation of her own sexual abuse allegation against Defendant Martin as well as others and intends to continue to do so in the course of this litigation.

48. Beyond the specific allegations against C.O. Martin, the City, Mayor and Commissioner are aware, or should be aware, of the incidents of sexual misconduct that take place on Rikers Island and specifically the Rose M. Singer Center, but fail to take any action or take action that is wholly inadequate.

49. Allegations of rapes and sexual assaults by jail guards on inmates go back decades.[2]

50. A 2013 Bureau of Justice Statistics survey found 5.9 percent of Rikers inmates housed at the all-female Rose M. Singer Center said they were sexually assaulted by staff compared to a national average of 1.8 percent for all jails.[3] The Report designates RMSC as one of 12 prisons of jails *nationwide* with a particularly high incidence of staff sexual misconduct.

51. In 2015, Letitia James, the Public Advocate for the City of New York (the second highest elected office in the City) submitted proposed rules to conform with the Prison Rape Elimination Act ("PREA") and stated "[f]or too long, the problems of sexual harassment, coercion,

---

[2] https:/ /timesmachine.nytimes.com/timesmachine/1969/12/23/1034 76090.html?pageNumber=39;
https:/ /www.nytimes.com/1987 /12/12/nyregion/new-york-city-jails-system-inturmoil.
html?searchResultPosition=29;
https:/ /www .nytimes.com/1990/09/01/nyregion/inside-rikers-island-a-bloody-struggle-for-control.html
https://www.hrw.org/legacy/reports/1996/Usl.htm
https://www.nytimes.com/2000/07/04/nyregion/rikers-guardis-charged-with-raping-an-inmate.html
https://www.nytimes.com/2003/10/11/nyregion/rikers-officercharged-with-raping-inmate.html
https://www .nytimes.com/2006/02/01/nyregion/rikers-captain-is-accused-of-sexual-abuse.html

[3] *Sexual Victimization in Prisons and Jails Reported by Inmate*s Allen J. Beck, PhD, taken on September 10, 2024 from https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf.

8

and rape on Rikers Island have not received necessary attention."

52. In 2003, the federal government passed the PREA. 34 U.S.C. §30301 *et seq*. Among its stated purposes is to set a zero tolerance standard for prison rape and make it a top priority in prisons across the country. 34 U.S.C. §30302. It also directed the Department of Justice to promulgate rules to codify national standards for the prevention of prison rapes. Id. In June 2012, the rules were promulgated.

53. More than seven years later, in September 2019, DOC announced that the Rose M. Singer Center was certified PREA compliant. Notably, 47 states had been certified PREA Compliant in 2014.

54. However, there is good reason to believe that its certification for PREA compliance is built on fraudulent claims and records. For example, under PREA rules supervisors are required to do unannounced rounds of the facility to identify and deter instances of sexual abuse and harassment. The Board of Corrections, a New York City agency, monitors the DOC, including its PREA compliance. In 2019 the Board found that according to facility logbooks, the rounds are happening as required by PREA. However, in a review of video to corroborate the rounds, it found that 38% of the time the officers, captains, and deputy wardens who signed the logbooks did not actually conduct the rounds. They simply signed the book indicating they had completed the round without conducting the round. This is not only a violation of DOC rules but the crime of falsifying official records.[4]

55. The Board of Correction also found that the DOC's recordkeeping related to

---

[4] Board of Correction Board Meeting, Special Hearing, April 23, 2019 tr. Pp. 13-14. Taken on September 10, 2024 from
https://www.nyc.gov/assets/boc/downloads/pdf/Meetings/2019/April/Transcript%20of%20Special%20Hearing_04-23-2019.pdf

allegations of rape and sexual abuse did not meet minimum standards.[5]

56.     Further, the Board found that instead of the required 90 days to complete investigations of sexual abuse, it takes the DOC on average 350 days and despite all the additional time investigations are often lacking in completeness.[6]

57.     According to official data, the amount of time it takes to complete investigations has come down significantly since the Board's 2019 findings.  However, it seems likely that the reason for the improved speed of investigations is that they are not taken seriously.

58.     According to DOC data that has been required to be provided to the Board of Correction since 2018, the DOC has a PREA investigation substantiation rate of 2.6% from July 2018 until June 2023.  By contrast, the last data from the Department of Justice tallies of PREA allegations and investigations from 2019-2020 shows that the nationwide substantiation rate is 9.8%.  The 2019-2020 substantiation rate by DOC is 2.7%.

59.     On January 1, 2022, the incoming Adams administration appointed Defendant Louis Molina as DOC Commissioner.

60.     Among his first orders of business was to fire DOC's Deputy Commissioner for Intelligence and Investigation Sarena Townsend on January 4, 2022.

61.     Since 2015, Rikers Island has been overseen by a Monitor appointed by a federal court, Steve Martin.  Mr. Martin was appointed because of the pervasiveness of the use of excessive force on Rikers Island, among other things.

62.     In a court proceeding 0n December 22, 2021, Mr. Martin stated that Deputy Commissioner Townsend had successfully reduced a massive backlog of disciplinary investigations against officers and that "continued leadership and expertise is critical to the success

---

[5] Id. at p.11.
[6] Id. at p. 12.

of this reform effort."[7]

63. The Correction Officers Union resented her efficiency in investigating its members. On the day she was fired the Union accused her of writing up officers on frivolous charges and, pleased with Commissioner Molina's actions, bid her "good riddance".[8]

64. Ms. Townsend noted that "I was fired because the unions did not like that I was holding their members accountable and the Commissioner wanted to be in good favor with the unions." For his part Defendant Mayor Adams said that he trusted Commissioner Molina to "get Rikers under his control."[9]

65. Defendants Mayor Adams and Commissioner Molina's "control" of Rikers Island has been marked by efforts to undermine transparency and accountability. So much so that the Speaker of the New York City Council, Adrienne Adams, stated in June 2023 that she was considering "legislative solutions to address this administration's backtracking on transparency and undermining of oversight."[10]

66. On June 8, 2023 (just days before the incident), Steve Martin, the Federal Monitor, filed a remarkable status report to the court. After noting the good relationship between himself and DOC and the forthrightness with which DOC dealt with him, he noted some deterioration at the end of 2021. He then stated:

> The collaboration with the Monitoring Team further devolved in early 2022 with the transition to the current Department leadership. In its March 16, 2022 Report, the Monitoring Team noted: "Since the New Year [2022], the Department has altered its management of its compliance efforts with the Monitoring Team to essentially eliminate the proactive and collaborative approach that previously

---

[7] https://www.prisonlegalnews.org/news/2022/may/1/nyc-doc-internal-affairs-investigator-claims-she-was-fired-not-siding-guards-union/
[8] https://www.thecity.nyc/2022/01/04/eric-adams-jail-commissioner-pushes-out-acclaimed-investigations-head/
[9] https://www.prisonlegalnews.org/news/2022/may/1/nyc-doc-internal-affairs-investigator-claims-she-was-fired-not-siding-guards-union/

[10] https://www.nytimes.com/2023/06/08/nyregion/rikers-island-jail-report.html

existed, reduced its level of cooperation, and limited its information-sharing and access in ways which inhibit the work of the Monitoring Team." *See* March 16, 2022 Report at pgs. 24 to 29. Some improvement to the Department's position on information-sharing and willingness to collaborate was observed following the issuance of the Monitor's March 16, 2022 Report, but these improvements were not sustained. In late 2022 and early 2023, similar problems began to re-emerge and have grown since then. The problems reported herein have culminated in a lack of transparency, consultation, and collaboration that has impacted the Monitoring Team's work.[11]

67. Defendant Commissioner Molina was removed from his job as Commissioner of the DOC on October 31, 2023 by Defendant Mayor Adams, but the damage was done. For almost two years Commissioner Molina presided over a Department of Correction that sought to quash officer accountability and hide misconduct from public view.

68. When rank and file correction officers know that they will not face consequences and that misconduct will be covered up by leadership, they will be far more likely to engage in misconduct such as Defendant Correction Officer Martin visited on Plaintiff Jessica Brenner.

## NOTICE OF CLAIM

69. On September 6, 2024 Plaintiff served the City of New York with a Notice of Claim. On September 13, 2024, Plaintiff filed a Motion for Leave to File a Late Notice of Claim, with the Bronx County Supreme Court within the one year and 90 day time period. The motion is pending. This suit has similarly been filed within the one year and 90-day time period.

## VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION LAW

70. The above referenced law permits victims of gender biased crimes of violence to file claims regardless of whether the applicable statute of limitations has run until two and one half years from September 1, 2022, or until March 1, 2025. N.Y. Ad. Code Title 11 §10-1105.

---

[11] Nunez v. New York City Department of Correction, 11cv5845 (LTS) ECF #541 (June 8, 2023).

**JOINT LIABILITY**

71. This action falls within one or more of the exceptions set forth in CPLR §1602.

**DAMAGES**

72. As a direct and proximate result of the acts of defendants, the Plaintiff suffered the following injuries and damages:

    a.    Physical pain and suffering;

    b.    Emotional trauma and suffering, including fear, humiliation, emotional distress, frustration, fright, horror, grief, depression, loss of sleep, and increased levels of anxiety;

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW OR TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT**
(AS TO ALL DEFENDANTS)

73. The above paragraphs are here incorporated by reference.

74. Defendants acted under color of law and conspired to deprive Plaintiff of her civil, constitutional and statutory right to be free from cruel and unusual punishment under the Eighth Amendment and/or due process of law under the Fourteenth Amendment when they subjected her to the sexual abuse detailed in this Complaint.

75. Plaintiff suffered physical harm and psychological and emotional distress due to Defendants' wrongful acts.

76. Defendants acted with malicious intent, purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C. §1983.

## SECOND CAUSE OF ACTION
## MUNICIPAL AND SUPERVISORY LIABILITY UNDER 42 U.S.C. § 1983)
### (AS TO DEFENDANTS THE CITY OF NEW YORK, MAYOR ADAMS AND COMMISSIONER MOLINA)

77. The above paragraphs are here incorporated by reference.

78. The City, Mayor Adams and Commissioner Molina are liable for the damages suffered by Plaintiff as a result of the conduct of their employees, agents, and servants, in that (as detailed above), knowing of their employees' violation of the rights of detainees to be free from sexual abuse, they failed to remedy the wrong; they have created a policy or custom under which such unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent and deliberately indifferent in managing subordinates who caused the unlawful condition or event. These Defendants have been alerted to the regular occurrence of sexual abuse by its correction officers inside the correctional facilities of Rikers Island and especially inside the Rose M. Singer Center, but have nevertheless exhibited deliberate indifference to such sexual misconduct; that deliberate indifference caused the violation of Plaintiff's constitutional rights.

79. Defendants Mayor Adams, Commissioner Molina and the City by themselves and their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

80. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of Mr. Karim's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Eighth and Fourteenth Amendments.

81. As a result of the foregoing, the Plaintiff suffered the injuries and damages alleged

herein.

### THIRD CAUSE OF ACTION
### VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION LAW
(AS TO ALL DEFENDANTS)

82. The above paragraphs are here incorporated by reference.

83. Defendant C.O. Martin, while employed as and acting as a correction officer employed by the New York City Department of Correction, engaged in the sexual abuse against the Plaintiff described in the above paragraphs.

84. The sexual abuse described in the above paragraphs constitute crimes of violence under the New York State Penal Law, including but not limited to N.Y.P.L. §130.65. (*See also* N.Y.P.L. §130.05(3)(f) providing that a prisoner cannot "consent" to a correction officer's sexual requests.)

85. As described above, Defendant C.O. Martin's crime against Jessica Brenner was motivated by her gender.

86. The City, Mayor Adams and the Commissioner Molina enabled and allowed C.O. Martin's crimes against Jessica Brenner by detaining her but breaching the duty of care owed to her and all other female detainees through their omissions and commissions described in the above paragraphs.

87. As a result of the foregoing, the Plaintiff suffered the injuries and damages alleged herein.

### FOURTH CAUSE OF ACTION
### ASSAULT
(AS TO ALL DEFENDANTS)

88. The above paragraphs are here incorporated by reference.

89. Defendant C.O. Martin made Plaintiff fear for her physical well-being and safety

15

and placed her in apprehension of immediate harmful and/or offensive touching.

90. Defendants have deprived Plaintiff of her civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, 42 USC §1983 and New York State laws and Constitution.

91. Plaintiff was damaged by Defendants' assault.

## FIFTH CAUSE OF ACTION
### BATTERY
(AS TO ALL DEFENDANTS)

92. The above paragraphs are here incorporated by reference.

93. Defendant C.O. Martin engaged in and subjected Plaintiff to immediate harmful and/or offensive touching and battered her.

94. Defendants have deprived Plaintiff of her civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to Plaintiff under common law, 42 USC §1983 and the New York State Constitution.

95. Plaintiff was damaged by Defendants' battery.

## SIXTH CAUSE OF ACTION
### NEGLIGENT HIRING & RETENTION
(AS TO DEFENDANTS CITY, MAYOR ADAMS AND COMMISSIONER MOLINA)

96. The above paragraphs are here incorporated by reference.

97. Defendants City, Mayor and Commissioner through the DOC, owed a duty of care to Plaintiff to prevent the injury sustained by Plaintiff.

98. Defendants City, Mayor and Commissioner through the DOC, owed a duty of care to Plaintiff because under the same or similar circumstances a reasonable, prudent and careful person should have anticipated an injury to Plaintiff or those in a position similar to Plaintiff's as a result of the conduct of the City's employees.

99. Defendant Officer Martin was plainly unfit for his position as a correction officer overseeing the welfare and well-being of female detainees.

100. Defendants City, Mayor and Commissioner knew or should have known through exercise of reasonable diligence that Defendant Officer Martin was potentially dangerous and was prone to acts of gratuitous violence and sexual violence against detainees.

101. Defendant City, Mayor and Commissioner's negligence in hiring and retaining Defendant Officer Martin proximately caused Plaintiff's injuries.

102. Because of the Defendant City, Mayor, and Commissioner's negligent hiring and retention of Defendant Officer Martin, Plaintiff incurred damages described above.

**SEVENTH CAUSE OF ACTION**
**RESPONDEAT SUPERIOR**
(AS TO CITY OF NEW YORK)

103. The above paragraphs are here incorporated by reference.

104. Defendants negligent and deliberate acts were undertaken within the scope of their employment by defendant City of New York, through DOC and in furtherance of the defendant City of New York's interest.

105. As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, plaintiff was damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this

action; and

      D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:    New York, New York
              September 13, 2024

Yours, etc.,

By: _____*Leo Glickman*_____
Leo Glickman (LG3644)
Stoll, Glickman & Bellina, LLP
5030 Broadway, Ste. 652
New York, NY 10034
(718) 852-3710
lglickman@stollglickman.com